IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

JTH TAX, INC., d/b/a LIBERTY
TAX SERVICE,

      Plaintiff,

v.                        CIVIL NO. 2:11CV59

TROY CLARK and SOUTHWEST TAX
STORES, LLC,

      Defendants.


VOLUME 2


DEPOSITION OF TROY CLARK
May 23, 2011
1:26 p.m.
500 4th Street, Suite 105
Albuquerque, New Mexico 87102


     PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:


TAKEN BY:  SADA L. SHELDON
            ATTORNEY FOR PLAINTIFF


REPORTED BY:  PAUL BACA, CCR #112
              PAUL BACA COURT REPORTERS
              500 4th Street, NW, Suite 105
              Albuquerque, New Mexico 87102

EXHIBIT
3

Bumberg No. 5208

1   directed her where to apply those.

2      Q.    And are these accounts the same accounts

3   that we have already gone over?

4      A.    Yes.

5      Q.    Do you have a record of these payments?

6      A.    Yes.

7      Q.    And where is that record?

8      A.    It would be contained within the bank

9   statements of Southwest Tax, as well as there's a

10   schedule that I have on Excel to apply against the

11   outstanding promissory notes.

12      Q.    Now who directs those payments into

13   Southwest's account -- into the Southwest accounts?

14      A.    Could you please clarify the question?

15      Q.    Do you know who directs the payments on

16   Freedom Tax to Southwest Tax?

17      A.    Kim Gutierrez directs the payment from

18   Freedom Tax.

19      Q.    Have you ever initiated a transaction from

20   the Freedom Tax accounts to the Southwest Tax

21   accounts?

22      A.    In conjunction with Ms. Gutierrez, yes.

23      Q.    What do you mean by "in conjunction with"?

24      A.    As we met to go through the process of --

25   if we were at my house and logged on to my computer

1    on the account, we would be logged in under my name

2    and initiate the transaction.

3          Q.    What are other reasons why you'd log on to

4    the Freedom Tax account?

5          A.    As a signator on the account, having

6    other -- my other account at Wells Fargo, every time

7    I log in to one of my accounts the Freedom account

8    pulls up, so there is not a specific account into

9    Freedom Tax.

10         Q.    Why is your being a signator a part of the

11   condition of your purchase and sale with Freedom

12   Tax?

13         A.    That was an agreed-upon point with the

14   asset sale.

15         Q.    Why did you include it in the agreement?

16   What was your reasoning for including it in the

17   agreement?

18         A.    I had a $520,000 balance owed to me and

19   wanted to be able to see where the funds were at at

20   any point in time; simple form of collateral.

21         Q.    Have you ever put any money into the

22   Freedom Tax account?

23         A.    Not to my knowledge.

24         Q.    Let me clarify.  Has Southwest Tax ever

25   put any money into the Freedom Tax account?

1    the promissory note?

2        A.    If you look at the last paragraph of

3    Section 1.4 beneath the earn-out agreement --

4        Q.    Okay.

5        A.    -- on December 31 of the current year any

6    and all reductions in the purchase price were

7    reflected in a cancellation of the existing

8    promissory note upon the buyer entering into a new

9    revised promissory note with the appropriate

10   reduction in the outstanding balances.

11             So what will happen is if the conditions

12   necessitate, according to Section 1.4, a reduction,

13   then the old promissory note will be cancelled and

14   the new one will be entered into, but only if a new

15   one is entered into for the applicable dollars.

16       Q.    So what was Freedom Tax's revenue so far,

17   January 1st, 2011, through, I don't know, April 30,

18   2011?

19       A.    You'd have to ask Freedom Tax that

20   question.

21       Q.    Have they given you any reports on their

22   revenues since operations?

23       A.    They have.

24       Q.    And when were those reports made?

25       A.    On a daily basis.

1   documents that you sent me this morning?

2               MS. SHELDON:  Yes.

3               MR. GAYNOR:  Let me take a look at them

4   first.

5               MS. SHELDON:  Sure.

6               (A recess was taken from 2:00 p.m. to 2:02

7   p.m.)

8               (Exhibit marked, 17.)

9       Q.   (By Ms. Sheldon)  Okay.  Now, where were

10  we?  Exhibit -- well, I've marked these one, two,

11  three, four checks as Exhibit 17.  The first page

12  is -- the first check was made out to San Mateo

13  Indian School, LLC, in the amount of $2,400.  Do you

14  know what that payment was for?

15              MR. GAYNOR:  Remember her admonition

16  earlier in the day, which was to not guess.

17      A.   This payment was made for the initial down

18  deposit and January rent.

19      Q.   (By Ms. Sheldon)  Okay.  And is that your

20  signature on this check?

21      A.   Yes.

22      Q.   What was the reason why you would write

23  this check?

24      A.   Ms. Gutierrez and I sat together to go

25  through the bills as we were contemplating the

1    transaction.  And she was there, I was there, I just

2    happened to sign them.  I'm a signator on the

3    account.  It was a bad habit of grabbing checks off

4    the printer and signing them.

5         Q.    And then it looks like there is also a

6    check made out to, you said, Mike S. Bilow for

7    $1,550.  Do you recall what this check was for?

8         A.    If we're referring to check number 3102,

9    it's for $1,500 even.  That would be for the January

10   rent of the Rio Rancho location.

11        Q.    Okay.  Is that your signature?

12        A.    Yes.

13        Q.    And what was the reason you signed this

14   check for Freedom Tax?

15        A.    The same as before.  Kim and I got

16   together to pay the bills, and I grabbed them off

17   the printer and signed them.

18        Q.    Was it the same day as the other check we

19   just looked at?

20        A.    Yes.

21        Q.    And the next check, check number 3104,

22   made out to Eubank Plaza West Investors for

23   $1,172 -- is that two cents or is that --

24        A.    That's correct.

25        Q.    What was this check for?

1     A.    The check was for the January 2011 rent

2   for the Eubank location.

3     Q.    Is that your signature?

4     A.    Yes.

5     Q.    And was this check signed on the same day

6   as the other two?

7     A.    Yes.

8     Q.    Okay.  And then the last check,

9   number 303, made out to Laramie Square for $1,050,

10  also January rent.  Is that correct?

11     A.    Clarification.  That would be check

12  number 3103.

13     Q.    3103.  Thank you.

14     A.    That was for the January rent of the

15  San Mateo location, at 3118 San Mateo.

16     Q.    And it's got your signature?

17     A.    Yes.

18     Q.    And was this signed on the same day as the

19  other three checks?

20     A.    Yes.

21     Q.    You said you signed these checks.  You and

22  Kim had sat down and gone over bills together?

23     A.    That's correct.

24     Q.    And what was the purpose of that meeting?

25     A.    To go over the bills that were then due,

1    residence at 11475 Ranchitos Road, Northeast.

2        Q.    Okay.  When is the last time you spoke

3    with Ms. Gutierrez?

4        A.    Last week, I believe.

5        Q.    And what was the conversation about?

6        A.    We stay in constant communication, so I

7    don't remember the exact details.  Most likely over

8    the scheduling times of the depositions.  That was a

9    topic that was discussed.  Was it discussed in the

10   last one?  I don't have a recollection.

11       Q.    How do you two usually communicate?

12   E-mail?  Phone?

13       A.    Usually by phone.

14       Q.    And how frequently do you communicate with

15   each other?  Do you speak every week?

16       A.    It varies.  I mean for all forms of

17   communication throughout the tax season, she would

18   e-mail me daily reports, if that is a means of

19   communication.

20             How often do we talk on the phone?  It

21   could be two days in a row, it could go two days

22   without talking.

23       Q.    Have you discussed this lawsuit?

24             MR. GAYNOR:  I object as to the vague

25   nature of that question.

1                          CERTIFICATION

2

3          I, the officer before whom the foregoing

4     deposition was taken, do hereby certify that I

5     personally recorded the testimony of the witness

6     whose testimony appears in the foregoing deposition;

7     that said deposition is a true record of the

8     testimony given by said witness; that I am neither

9     attorney for, related to, nor employed by any of the

10    parties to the action in which this deposition is

11    taken, and that I am not a relative or employee of

12    any attorney employed by the parties hereto, or

13    financially interested in the action.

14

15

16                        _____
                          PAUL BACA, RPR, CCR
17                        Certified Court Reporter #112
                          License Expires:  12-31-11
18

19

20

21

22

23

24

25

PAUL BACA PROFESSIONAL COURT REPORTERS