Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION


JTH TAX, INC., d/b/a
LIBERTY TAX SERVICE,
        Plaintiff,

VS.                         NO. 2:11cv59

TROY CLARK and
SOUTHWEST TAX STORES, LLC
        Defendants.



*****************************************
DEPOSITION OF TROY CLARK
Volume 1
May 23, 2011
9:29 a.m.
500 Fourth St. NW, Suite 105
Albuquerque, New Mexico 87102
*****************************************



PURSUANT TO THE FEDERAL RULES OF CIVIL

PROCEDURE, this deposition was:


TAKEN BY:   Ms. Sada L. Sheldon
            ATTORNEY FOR PLAINTIFF


REPORTED BY:Jeannine K. Sims, RPR, NM CCR #12
            Paul Baca Court Reporters
            500 Fourth Street NW, Suite 105
            Albuquerque, New Mexico  87102



EXHIBIT

PAUL BACA PROFESSIONAL COURT REPORTERS

1          Q.    What was your degree in?

2          A.    Accounting.

3          Q.    What year did you graduate?

4          A.    Graduated with both a bachelor's and

5     master's in 1995.

6          Q.    Was your master's and bachelor's in

7     accounting?

8          A.    Yes.

9          Q.    Do you have any other degrees?

10         A.    No.

11         Q.    That's plenty.  Do you have any other

12    certifications?

13         A.    Certified public accountant in inactive

14    status.

15         Q.    Okay.  So in the last ten years what types

16    of employment have you had?  You can --

17         A.    Takes us back to 2000.  In 2000 I was

18    employed by Medisphere Health Partners, a healthcare

19    company based in Nashville, Tennessee.  While with

20    Medisphere -- this may extend a little prior to ten

21    years, but I was a director of acquisition -- mergers and

22    acquisition, I was a vice president of operations, and

23    vice president of operations for the facilities division.

24         Q.    That was all with Medisphere?

25         A.    That's all with Medisphere.  In 2004 --

1      Q.    Was that the only you job you had at that

2   time?

3      A.    With Medisphere?

4      Q.    In 2000?

5      A.    Yeah.   2000 that extended through 2004

6   Medisphere was sold, I did independent consulting for

7   approximately six months with hospitals.

8      Q.    Was Medisphere -- they're headquartered in

9   Nashville but --

10      A.    That's correct.

11      Q.    -- where did you actually work?

12      A.    I was based out of Nashville, but I had

13   responsibilities across the country.  I was vice

14   president for operations.  We had operations in Redding,

15   California; Oklahoma City; Fayetteville, Arkansas;

16   Cincinnati, Ohio; Dallas, Texas.  Actually it was

17   Duncanville, Texas; Tyler, Texas; Miami, Florida;

18   Louisville, Kentucky; Lexington, Kentucky; Knoxville,

19   Tennessee; Memphis, Tennessee; Birmingham, Alabama;

20   Jackson, Mississippi.  I think I've covered them all.

21      Q.    And where did you live at that time?

22      A.    I lived in Nashville, Tennessee.

23      Q.    In Nashville, Tennessee.  Okay.  In 2004 you

24   became an independent consultant?

25      A.    2004 I did independent consulting for some

1    of the hospitals that I had worked with as Medisphere as

2    they transitioned to the new company and then --

3           Q.   Were you also in Nashville at that --

4           A.   Still in Nashville.

5           Q.   Still in Nashville.

6           A.   And in I believe May, sometime late spring,

7    early summer I took employment with Ardent Hospital

8    Services who was based out of Nashville, Tennessee, but I

9    took responsibility for a hospital project in

10   Albuquerque, New Mexico.

11          Q.   Okay.

12          A.   Then in late 2005 I began a healthcare

13   consulting company originally titled TSR Health and later

14   with a name change to Plaza Health Partners.

15          Q.   Is that a company that you owned, TSR

16   Health?

17          A.   That's a company that I have a 33 percent

18   ownership position.  Or let me clarify that.  I own a

19   company by the name of TSC Inc., TSC 1 Inc., which I own

20   a hundred percent of.  TSC 1 Inc. owns 33 percent of

21   Plaza Health Partners.

22          Q.   Why the name change?

23          A.   Process of business.  Nothing -- no

24   monumental event.

25          Q.   It was better marketing name?

1          A.    The original name was the initials of the

2     three founders so we went to a more --

3          Q.    Generic --

4          A.    Calming business name.  Then in January of

5     2010 -- I'm sorry, 2011 I accepted a full-time position

6     with the University of New Mexico Medical Group to be the

7     chief financial officer and vice president of financial

8     services for a hospital under construction by the name of

9     Sandoval Regional Medical Center.

10         Q.    That's where you work now?

11         A.    That's where I work.

12         Q.    So what does Plaza Health do?

13         A.    Plaza Health did healthcare consulting for

14    hospitals, surgery centers, physician offices, and also

15    financial institutions that were investing in healthcare

16    funding.  -- healthcare lending.  I'm sorry.

17         Q.    And is this company still active?

18         A.    It has not been closed down but there's no

19    active business.

20         Q.    Have you owned any or been involved in any

21    other business over the last ten years?

22         A.    TSC, Inc., owned a 20 percent interest in

23    Southwest Tax Store in 2005 and then I believe it was the

24    fall of 2007 TSC Inc., acquired the remaining 80 percent

25    and owned a hundred percent of Southwest Tax Stores.

Page 13

1        Q.    Sorry.  What year was that again?

2        A.    2007.

3        Q.    So who owned --

4        A.    I believe it was September.

5        Q.    Who owned the other 80 percent of Southwest

6   Tax prior to that?

7        A.    There were four other partners.  Scott

8   Vincent, Brian Vaughan, Richard Fontg, F-O-N-T-G.  I

9   can't think of who I named.  Did I name Tim Parker?  Tim

10  Parker would be the other one.  Each of 20 percent.

11       Q.    Okay.  So what are your current

12  responsibilities at Sandover Regional Medical Center?

13       A.    Sandoval Regional --

14       Q.    Sandoval.

15       A.    -- Medical Center.  I'm in charge of all

16  financial activities, all financial related activities

17  and we are under construction so I also work with the

18  contractor to get the -- oversee and make certain that

19  the facility is getting constructed but also establishing

20  all the infrastructure and staffing over the next 12

21  months, 13 months I guess until we open.

22       Q.    Do you have employees that work under you?

23       A.    Currently have one that's started and one

24  that's been offered employment but has not yet started.

25       Q.    And what's your salary at this job?

1    to the Liberty brand specifically?

2         A.   No.  He was already a franchisee.

3         Q.   And how many franchises did you purchase at

4    that time?

5         A.   Let me clarify.  Mr. Parker owned and

6    operated one franchise and had territory rights to either

7    two or three, I believe.  He had -- he had I believe he

8    had franchise rights to three others that he had not

9    opened.  It may have been two.

10         Q.  So at the time --

11         A.   Liberty's records could clarify that though.

12         Q.  So at the time you took over you only

13    remember there being one territory --

14         A.   There's only one operational territory.

15         Q.  -- operating?

16         A.   And we didn't take over as much as we

17    partnered with him.  He still remained to be a partner.

18         Q.  The four of you.  Was it all four of you at

19    that time?

20         A.   Five.

21         Q.  At that time there was five?

22         A.   There was five.  There was Tim Parker, Brian

23    Vaughan, Scott Vincent, Ricardo Fontg and myself.

24         Q.   Okay.  And then you opened up the other

25    three territories later?

Page 16

1          A.   We did open the other three territories

2     later and acquired two other territories.

3          Q.   And why did you acquire the other two

4     territories?

5          A.   In the process of our buying into the --

6     into the franchisee, partnering up with Tim we also

7     purchased the area developer agreement for the state of

8     New Mexico, one of the franchisees had one open store,

9     one unopened territory, and she was not paying her

10    royalties so we bought her out.

11         Q.   And what was your reasons for doing that?

12         A.   As the area developer with her not paying

13    her franchise fees we were not collecting any of the

14    royalties that we were due, so we acquired her store so

15    we could capture those.

16         Q.   Why did you purchase an AD territory?

17         A.   As we discussed the acquisition with

18    Mr. Parker the opportunity came up given the number of

19    partners that we had, we felt that with the number of

20    territories he had unopened that we could leverage off

21    that and sell other territories to other franchisees and

22    therefore reduce our royalties on a net basis as the area

23    developers received half the royalties that were paid.

24         Q.   Okay.  Did you attend EOT training in

25    Virginia?

1          A.   I eventually did, yes.

2          Q.   Are you aware if any of the other four

3    partners attended EOT?

4          A.   Mr. Parker I assume did.  I don't have

5    knowledge, but I assume that he did prior to his

6    acquisition of the initial territories.

7          Q.   What about the other --

8          A.   The other three did not to my knowledge.

9          Q.   What were their role in the Liberty Tax

10   franchises?

11         A.   The initial roles that we had were for

12   Mr. Vaughan to operate the stores locally, he was someone

13   that Mr. Parker brought to the partnership.  The other

14   three of us had our healthcare business we started off as

15   silent partners with the role to focus on the area

16   developer franchise sales.  So that will be Mr. Vincent,

17   Mr. Fontg and myself.

18         Q.   Okay.  Approximately how many employees did

19   you have in Southwest Tax in 2010?  Now --

20         A.   2010.

21         Q.   I'm sorry, I'm just going to ask a question.

22   Did Southwest Tax own other companies other than the

23   Liberty franchises?

24         A.   No.

25         Q.   Okay.  So Southwest Tax was the Liberty

1   that name to you?

2         A.   As the area developer for me to follow up on

3   as a potential lead for a franchise sale.

4         Q.   Okay.  And what happened?  What was the

5   result of that meeting?

6         A.   I met with Ms. Gutierrez and discussed the

7   opportunities and obligations of a franchisee with

8   Liberty Tax and also discussed if that was not an option

9   she wanted to take immediately that we could work on a

10  arrangement where she could come to work for me in my

11  offices to get to know the Liberty system.

12        Q.   So then what happened next?

13        A.   She determined that she did not want to

14  purchase a franchisee but was willing to come work for

15  Southwest Tax Stores and grow in the business.

16        Q.   So she came to work for you for Southwest

17  Tax?

18        A.   For Southwest Tax Stores.

19        Q.   For Southwest Tax.  And do you remember what

20  year that was?

21        A.   I believe it was 2006.

22        Q.   And what did you hire her to do?

23        A.   She came on as director of marketing to

24  increase the returned account at our various offices.

25        Q.   What office did she work in?

1    "information would have to be requested from Freedom

2    Tax."  Are you -- are you listed as a signatory on any

3    account for Freedom Tax?

4             A.   Yes.

5             Q.   What accounts are those?

6             A.   It's a Freedom Tax.  She uses her operating

7    account.  I don't have the account number.

8             Q.   How many accounts for Freedom Tax are you a

9    signatory on?

10            A.   Just the whatever she's calling her

11   operating account.

12            Q.   And why are you a signatory on that account?

13            A.   Part of the conditions and requirements of

14   the sales agreement.

15            Q.   Okay.  When did you first meet Kim

16   Gutierrez?

17            A.   The best of my recollection it was in 2006

18   or 2007.  I don't recall with specificity.

19            Q.   And where did you meet her?

20            A.   Here in Albuquerque.

21            Q.   And what was the events surrounding that

22   meeting?

23            A.   Liberty Tax had forwarded her name as a

24   potential franchisee.

25            Q.   And what was the purpose behind forwarding

1          Q.    Did she have any other credentials or

2    experiences that attracted you to hire her?

3          A.    Her success in her career in the income tax

4    business was the main driver.

5          Q.    Okay.  Did Ms. Gutierrez have access to the

6    Liberty franchise operations manual?

7          A.    During the term of her employment, yes.

8          Q.    Did she have access to the paper customer

9    tax return files during the term of her employment?

10         A.    Yes.  They were all in the stores.

11         Q.    What about electronic customer tax return

12   information?

13               MR. GAYNOR:  I'm going to object.  What

14   about it?

15         Q.    (BY MS. SHELDON)  Did she have access to it

16   during the term of her employment?

17               MR. GAYNOR:  Thank you.

18         A.    Yes.

19         Q.    (BY MS. SHELDON)  Did Ms. Gutierrez sign an

20   employment agreement during any time that she worked for

21   you?

22         A.    No.

23         Q.    What was your reason for not having her sign

24   an employment agreement?

25         A.    Southwest Tax Stores did not utilize the

1   employment agreements.

2           Q.   What was your reason for not doing that?  Do

3   you know Southwest Tax's reasons for not doing that?

4           A.   As an ownership group we knew that the

5   noncompete provisions in the employment agreements were

6   unenforceable and also were a barrier to gaining

7   employees.  So we did not utilize them.

8           Q.   And Mr. Clark, Ron Clark is your father,

9   correct?

10          A.   That is correct.

11          Q.   And when did you hire Ron Clark?  I keep on

12  wanting to say Mr. Clark but that would be confusing.

13  When did you hire Ron Clark to work in your Southwest

14  Tax?

15          A.   I believe we brought Ron in in 2005.

16          Q.   And what did you hire him to do?

17          A.   We hired him as a general manager to oversee

18  what I would call the non-technical operations of the

19  stores.

20          Q.   Can you explain what you mean by --

21          A.   He was not a tax preparer.  So he oversaw

22  staffing, scheduling, hiring, waiving.  I think actually

23  I believe we brought him on in 2006.  I apologize.  I

24  believe we brought him on in 2006.

25          Q.   And what office did he work in?

1    advice.

2                    MS. SHELDON:  I appreciate --

3                    MR. GAYNOR:  The actual objection for the

4    record is that I think it assumes facts not previously

5    established on the record.

6                    MS. SHELDON:  Okay.

7          Q.   (BY MS. SHELDON)  Mr. Clark, is this an

8    agreement that you sent to Liberty Tax an agreement

9    between Southwest Tax and Freedom Tax?

10         A.   This was a signed term sheet that yes, I did

11   forward on to JTH, Inc.

12         Q.   Okay.  And had you and Ms. Gutierrez made an

13   agreement between Southwest Tax and Freedom Tax?

14         A.   This would be the term sheet that delineated

15   the discussions we'd had over the transaction at that

16   time.

17         Q.   And what became of this agreement?

18         A.   Nothing.

19         Q.   And why did nothing become of this

20   agreement?

21         A.   JTH Tax or their representative of Liberty

22   Tax clarified a point that my attorneys had missed in the

23   franchise agreement; that it had included the inclusion

24   of an asset being a customer list which was not allowed

25   per the franchise agreement.  And in the rediscussions of

1    Suite G.

2           Q.    Okay.

3           A.    That was not an office that I leased.

4           Q.    All right.  I'd like to show you Clark

5    Exhibit 5.

6                 (Marked Clark Exhibit No. 5.)

7           Q.    (BY MS. SHELDON)  This is a lease agreement

8    that was produced to me by Freedom Tax.  Lease agreement

9    was made and entered on the first day of September 2009

10   between Laramie Square Partners and Freedom Tax.  On the

11   very last page is a signature page that has you listed as

12   the tenant.  Is that your signature?

13               MR. GAYNOR:  Hold on.  Just to clarify.  For

14   the record we're looking at a non-sequentially numbered

15   document that contains approximately I believe it's ten

16   pages.  The first page at the very top says "San Mateo

17   Lease Agreement," been marked as Clark Exhibit 5.  And

18   just for the record we don't have a four, do we?

19               MS. SHELDON:  4 is going to be the purchase

20   and sale agreement.

21               MR. GAYNOR:  All right.  That's fine.  That

22   being said, I didn't mean to interrupt your flow there, I

23   just wanted to make sure the record was clear as to what

24   we're looking at.

25          Q.    (BY MS. SHELDON)  Have you seen this

1    document before, Mr. Clark?

2          A.    Yes.

3          Q.    Okay.   Does this document appear to be in

4    its entirety?

5          A.    To the best of my knowledge.

6          Q.    Okay.   And is that your signature on the

7    last page --

8          A.    Yes.

9          Q.    -- as tenant?   And do you recall why you

10   entered into this lease?

11         A.    There was a renewal of the space that we had

12   the office on San Mateo.

13         Q.    Why would you have entered into the lease as

14   Freedom Tax?

15         A.    This lease came up for renewal during the

16   time that we were initially contemplating a sale between

17   myself and Ms. Gutierrez.   We asked the landlord to

18   change the name to Freedom Tax.   And subsequently on the

19   signature of this as I believe it was retroactive, we

20   signed on October 1st.   The retroactive date we had asked

21   them to make the change assuming that the Freedom Tax

22   would have been completed, the transaction, it was not.

23   Ended up not being completed all during that year.   The

24   landlord had made the agreement, we did not go back and

25   ask them to switch it back and I made the signature of

1    the lease.

2           Q.    Okay.  And when is the last time Southwest

3    Tax paid rent on this office?

4           A.    The last time Southwest Tax Stores paid rent

5    on this office space would have been December of 2010.

6           Q.    And have you -- sorry.  Did you ever go back

7    and have this lease agreement changed for Southwest Tax

8    after the deal didn't go through?

9           A.    We did not.

10          Q.    And why not?

11          A.    I guess it was oversight on my part.  Like I

12   should not have signed it on behalf of Freedom Tax.

13          Q.    Okay.  So as far as you know, I just want to

14   clarify, this agreement is still between Laramie -- has

15   this agreement been assigned or changed in any way?

16              MR. GAYNOR:  Just for the record are you

17   referring to Exhibit 5?

18              MS. SHELDON:  Exhibit 5.

19              MR. GAYNOR:  Thank you.

20          Q.    (BY MS. SHELDON)  The lease agreement for

21   3118 San Mateo.

22          A.    Not to my knowledge.

23          Q.    Okay.  Now I'm going to show you Clark

24   Exhibit 6.

25              (Marked Clark Exhibit No. 6.)

1          Q.   (BY MS. SHELDON)   This lease was produced to

2     me by Freedom Tax.   The first page is a Renewal of

3     Commercial Lease between Southwest Tax and Eubank Plaza

4     West Investors for an additional three-year term.   Signed

5     on December 10th, 2010.   That's the first page; is that

6     correct?   A renewal of commercial lease for three years

7     between Southwest Tax and Eubank Plaza West Investors?

8          A.   I apologize, we were glancing through when

9     you started the question.   Would you please restate the

10    question so I hear it in its entirety.

11         Q.   Sure.   I'm just looking at the first page of

12    Exhibit 6.   At the top it say it's a renewal of a

13    commercial lease between Southwest Tax and Eubank Plaza

14    West Investors for an additional three-year term dated

15    December 10th, 2010; is that correct?

16         A.   That is correct.

17         Q.   And the second page is an Assignment of

18    Commercial Lease and Guarantee between Southwest Tax,

19    looks like you're assigning your interest with Eubank

20    Plaza West Investors to Freedom Tax; is that correct?

21         A.   That is correct.

22         Q.   But that you Troy Clark agree to remain as a

23    personal guarantor for the payment and performance of the

24    lease through April 30th, 2012; is that correct?

25         A.   That is correct.

Page 61

1          Q.   And why were you the guarantor for this

2    location?

3          A.   As stated earlier, she came to me to discuss

4    needing a guarantor to enter into this lease so that she

5    could operate business in that location.

6          Q.   And you believe that you saw the Exhibit E

7    guarantee without looking at the rest of the lease?

8          A.   I cannot recall if I saw the remainder of

9    the lease.  I do recall seeing Exhibit E the guarantee.

10         Q.   One more exhibit.

11              (Marked Clark Exhibit No. 9.)

12         Q.   (BY MS. SHELDON)  Exhibit 9, Clark

13   Exhibit 9.

14              MR. GAYNOR:  To 8, I don't have any

15   objections to that being entered.

16         Q.   (BY MS. SHELDON)  Okay.  We have Clark

17   Exhibit 9.  See the first page is titled Sublease

18   Agreement with Master Landlord's Consent.  This is a

19   sublease agreement, 1st day of July, 2008 between Mia

20   Huynh and American Home Realty.  Do you know who Mia

21   Huynh is?

22         A.   Yes.

23         Q.   Who is she?

24         A.   She is the owner and operator of American

25   Home Realty, LLC.

1          Q.    Okay.   And Troy Clark.

2          A.    Yes, I know who he is.

3          Q.    Southwest Tax.   Let's see.   So this is a

4    sublease agreement for Southwest Tax for the location --

5    let's see.   Are you familiar with this agreement?

6          A.    I am.

7          Q.    Can you tell us what this agreement is?

8          A.    This is the lease for the space as noted in

9    Paragraph 2 on Page 1, 475 Coors Boulevard Northeast,

10   Suite D in Albuquerque, New Mexico.

11         Q.    And this is now a Freedom Tax location.   Are

12   you also a guarantor of this lease with Freedom Tax?

13   Actually let me take that back.   I apologize.   Is this

14   lease still current between -- for Southwest Tax Stores?

15         A.    Could you clarify as to the time period

16   you're talking about.

17         Q.    For 2011.

18         A.    It expired April 30th of 2011.

19         Q.    April 30th of 2011.   Do you assign this

20   lease to Freedom Tax?

21         A.    I did not.

22         Q.    Have you renewed this agreement?

23         A.    I have not.

24         Q.    When is the last time you paid rent on this

25   location?   When is the last time Southwest Tax paid rent

Page 65

1          A.   I'll do my best.  One was located on Eubank

2    Boulevard I believe at 1449-A.  One was located on San

3    Mateo Boulevard at 3118.  One was located on Golf Course

4    Road in Rio Rancho, I believe 1009.

5          Q.   Okay.

6          A.   One was located on Coors Boulevard at 475,

7    Suite D.  One was located in Los Lunas on Main Street.

8          Q.   Okay.

9          A.   And I do not recall the address, one was

10   located in Belen.

11         Q.   That was your satellite office?

12         A.   That was the satellite office to the Los

13   Lunas store.

14         Q.   Okay.

15         A.   That was also on Main Street.  I cannot -- I

16   can't recall with specificity.

17         Q.   Do you recall the phone number for the

18   Liberty office at 1449-A Eubank Boulevard?

19         A.   Yes.

20         Q.   What was the phone number for that location?

21         A.   One of the phone numbers was 292-1924.

22         Q.   And what were the other -- what were the

23   other phone numbers?

24         A.   I don't recall.

25         Q.   Okay.  Do you know how Freedom Tax obtained

Page 66

1    possession of that telephone number?

2         A.   That telephone number was transferred to

3    Freedom Tax.

4         Q.   And how was that -- how was it transferred

5    to Freedom Tax?  What was the process?

6         A.   Contacting the Qwest representative and

7    changing the customer name on the account.

8         Q.   And who contacted Qwest to change the

9    customer name on the account?

10        A.   I do not recall.

11        Q.   Do you know who would recall?

12        A.   I do not.  Either Kim Gutierrez or myself.

13        Q.   And do you recall when Qwest was contacted

14   to transfer that phone number?

15        A.   I do not.

16        Q.   Do you have an estimation of a timeframe?

17        A.   Not with any specificity.

18        Q.   Would it have been in 2010?

19        A.   Sometime in 2009 or 2010.

20        Q.   In 2009 or 2010.  Why would you -- why would

21   the phone number have been transferred in 2009?

22        A.   Without knowing that it was, that was one of

23   the items that was discussed as being done when we

24   originally attempted the transaction in 2009.  That's why

25   I don't recall whether that was actually done in 2009 or

1    2010.

2          Q.   Okay.  Do you recall the phone number for

3    your Liberty office location at 3118 San Mateo Boulevard?

4          A.   Yes.

5          Q.   What was that phone number?

6          A.   Area code 505-883-5678.

7          Q.   And do you know how Freedom Tax was able to

8    acquire that phone number?

9          A.   By contacting Qwest and shifting the

10   customer responsibility for the account; same process as

11   the last one.

12         Q.   Would that have been done at around the same

13   time as you transferred the other phone number?

14         A.   Yes.

15         Q.   Okay.  Do you recall the phone number for

16   your location at 1009 Golf Course Road, Suite 104?

17         A.   Yes.

18         Q.   And what was that phone number?

19         A.   Area code 505-891-0772 I believe.

20         Q.   And how did Freedom Tax acquire that phone

21   number?

22         A.   Same process of contacting the Qwest

23   customer account rep and switching the name of the

24   responsible party from Southwest Tax to Freedom Tax.

25         Q.   And you have testified that you have no

Page 68

1    personal recollection of contacting Qwest?

2         A.   I don't recall if I did it or if Kim did it.

3         Q.   And you had given Kim authority to transfer

4    the phone number?

5         A.   Yes.

6         Q.   What had a location at 475 Coors Boulevard

7    Northwest, Suite D.  Do you recall the phone number for

8    that location?

9         A.   I believe so.

10         Q.   Can you tell us what that phone number is,

11    please.

12         A.   I believe it was 505-243 or 234-1639.

13         Q.   Were there any other phone numbers for that

14    location?

15         A.   Each store had additional phone numbers.

16         Q.   You can't recall what those phone numbers

17    are?

18         A.   I don't recall those numbers.

19         Q.   What about the Los Lunas location?

20         A.   I believe -- would you restate the question.

21         Q.   Can you tell me the phone number for the

22    Liberty office in Los Lunas.

23         A.   Thank you.  505- I believe it was 565-8282,

24    I believe.

25         Q.   Okay.  And what about the Belen location?

Page 69

1    Do you recall the phone number for the Liberty office in

2    the Belen location?

3            A.   I do not recall that phone number.

4            Q.   Okay.  Do you recall a phone number

5    505-268-0099?

6            A.   No, I do not.

7            Q.   That was not a phone number used in the

8    Liberty office?

9            A.   No, that was not.

10           Q.   How about 505-352-5405?  Was that a phone

11   number used in a Liberty location?

12           A.   Say that phone number one more time.

13           Q.   It's 505-352-5405.

14           A.   I believe that was one of the back line

15   numbers, the fax numbers.  Back line number was used as a

16   fax number.

17           Q.   Okay.  How would Freedom Tax have gotten

18   possession of that phone number?

19           A.   Same process as before, contacting the

20   customer account rep and transferring the number over.

21           Q.   Did you have a personal account rep for your

22   Qwest phone numbers?

23           A.   There were about six of them.

24           Q.   Okay.  I'm just going to take this back.

25                MR. GAYNOR:  Just to be clear, you're not

1          A.   I have not.

2          Q.   Have you seen a similar document?  Have you

3    seen a document that was substantially the same except at

4    the top it would have said Liberty Tax Client Data Sheet?

5          A.   It looks very similar to a document we used

6    as Liberty Tax.

7          Q.   And do you know who created this form?

8          A.   I do not.

9          Q.   Do you know what -- did you have forms like

10   this in your Liberty Tax offices?

11         A.   I did not have these forms.  As I said, we

12   had forms similar to this when I had the stores as

13   Liberty Tax Stores.

14         Q.   Okay.  Do you know what happened to the

15   forms that you had in your store?

16         A.   Hopefully they were used with clients that

17   came in.

18         Q.   When you sold your store did you have extra

19   forms in your offices?

20         A.   Any -- yes.

21         Q.   And do you know what became of those forms?

22         A.   Forms that had Liberty's logo on them were

23   run through a shredder machine.

24         Q.   Did you have any of those forms

25   electronically where you could just pull them up and

1    what the line items would have been.

2         Q.   Okay.  And then so but for this product

3    paper filing, what is it -- the way that this information

4    is presented for paper filing, electronic filing,

5    electronic refund check, and refund anticipation loan.

6    Is that substantially similar to the form you used at

7    your Liberty office?

8         A.   It appears to be without the basis of the

9    information, the wording I'm not certain is substantially

10   the same or not but the intent --

11        Q.   Okay.

12        A.   -- appears to be consistent with what we

13   used at Liberty Tax.

14        Q.   And why don't you go ahead and flip it over.

15   On the back side is a Tax Year Filing Status Flow Chart.

16   Are you familiar with this form?

17        A.   To the best of my knowledge this looks like

18   the flow chart that we used at Liberty Tax.

19        Q.   Okay.  Thank you.

20             MS. SHELDON:  I'm going to move to admit

21   Exhibit 14.

22             MR. GAYNOR:  Same objection; lack of

23   foundation for all the reasons previously stated for the

24   past three or four exhibits.

25        Q.   (BY MS. SHELDON)  Okay.  I'm going to show

1    long.  Maybe a half hour.

2              MR. GAYNOR:  This is your show.

3              MS. SHELDON:  We can do --

4              MR. GAYNOR:  How are you?

5              THE WITNESS:  I'm not parched yet.

6              MR. GAYNOR:  Okay.  Good.

7              (Marked Clark Exhibit No. 16A.)

8         Q.   (BY MS. SHELDON)  I'm going to show you --

9    this part of the discovery that you produced to us.  They

10   are Bates stamped Clark 0071 through Clark 00100.  And it

11   looks like these are release -- well, the form is Release

12   of Information and then it's "I," and it would be have

13   the person's name.  This particular one 0071 is Gregory

14   Lucero, "hereby authorize Southwest Tax Stores doing

15   business as Liberty Tax Service, LLC to release a copy of

16   my federal and state income tax returns for the following

17   years to Freedom Tax."  And then it has them sign, give

18   their Social Security number, the office that the

19   location was prepared.  Then they sign and date it.  I'm

20   just going to hand those to you.  Now, just generally can

21   you explain to me how that Release of Information worked?

22        A.   Would you clarify the question.

23        Q.   Well, let's start with who drafted this

24   form, who drafted the Release of Information?

25        A.   I did.

1          Q.    And why did you draft that?

2          A.    As having run Liberty Tax stores Southwest

3    Tax had clients who would need access to their tax

4    returns for various reasons; due to loans, mortgages, et

5    cetera.  Many here need them for applying for jobs with

6    the National Labs that are here located in town.  So as

7    to not leave my customers empty-handed I directed -- or I

8    constructed this release so that they could receive a

9    copy of their tax return.  Not their information that

10   they brought but the actual return itself if they did not

11   retain their own copy.

12         Q.    Okay.  And then who did you give these

13   releases to?  Like after you drafted it what did you do

14   with it after you drafted it?

15         A.    I gave a blank copy of the release of

16   information to Ms. Gutierrez.

17         Q.    And did you give her instructions on how to

18   use that release?

19         A.    Yes.

20         Q.    And what were your instructions to her?

21         A.    The instructions I gave if I had -- if one

22   of my customers came to her store needing a copy of the

23   returns since I had taken all of the processing computers

24   which had their -- the copies of their tax returns

25   available on them, that if they were in need of a copy of

1    that tax return and they filled out this form, that she

2    would then have her office fax this form up to me or

3    deliver this form to me.  And once I received a copy of

4    this form I would then take the computer for the relative

5    office, set it up, hook it up to the printer, print a

6    copy of the tax return and return that tax return back to

7    her.

8          Q.   And did you give -- you gave a blank copy to

9    Kim Gutierrez.  Did you give a blank copy to anybody

10   else?

11         A.   Not to my knowledge she was to disseminate

12   them throughout her stores.

13         Q.   Did you ever give this release to any

14   Liberty Tax stores?

15         A.   No.

16         Q.   Okay.  Are there any other releases of

17   information that you did not produce as part of your

18   discovery?

19         A.   As far as customers ones that are filled

20   out?

21         Q.   Uh-huh.

22         A.   No.  I gave you a complete set of ones I

23   received to the best of my knowledge.

24         Q.   Did you ever provide customer tax

25   information to somebody without a release of information

1    the left side of the picture?

2           A.   Yes.

3           Q.   And can you tell me what that is.

4           A.   That is a costume replica of the Statue of

5    Liberty.

6           Q.   And where did you obtain -- is that a

7    costume that Southwest Tax owned?

8           A.   It appears to be a costume that Southwest

9    Tax owned.

10          Q.   And where would you obtain -- where would

11   Southwest Tax have obtained that costume?

12          A.   I don't recall the specific vendor.  One of

13   the Liberty Tax vendors.

14          Q.   Are you able to recognize that employee?

15          A.   No.

16          Q.   Okay.  And is this a costume that would have

17   been left at your Southwest Tax stores --

18          A.   Yes.

19          Q.   -- when you sold them?

20          A.   Yes.

21          Q.   Did you feel any reason to remove the

22   costumes from the Southwest Tax tax offices?

23          A.   No.

24          Q.   Were they a part of the sale between you and

25   Freedom Tax?

1          A.    They were assets that were left in the

2     building.

3          Q.    Okay.  I'm going to move to admit

4     Exhibit 26.

5               MR. GAYNOR:  Same objections.

6               (Marked Clark Exhibit No. 27.)

7          Q.    (BY MS. SHELDON)  This is Clark Exhibit 27.

8     This is a photograph.  Are you able to identify the

9     location of this photograph?

10         A.    Yes.

11         Q.    And what's the location?

12         A.    This appears to be the San Mateo location

13    that Southwest Tax Stores operated at 3118 San Mateo

14    Boulevard.

15         Q.    And are you able -- if you look to the door

16    there you can see, it kind of looks to me like the Statue

17    of Liberty, like a Statue of Liberty costume.  Are you

18    able to -- do you recognize --

19              MR. GAYNOR:  I'm going to object to the

20    vagueness of that question.  I don't understand what's

21    being asked.

22         Q.    (BY MS. SHELDON)  Are you able to -- are you

23    able to identify the item that you can see right through

24    the door?  It's blue and yellow.

25         A.    It appears to be a Statue of Liberty mascot

1

2    THE STATE OF NEW MEXICO   :
     COUNTY  OF  BERNALILLO    :

3

4            BE IT KNOWN that the foregoing transcript of
     proceedings was taken by me; that I was then and there a
     Certified Court Reporter and Notary Public in and for the

5    County of Bernalillo, State of New Mexico, and by virtue
     thereof, authorized to administer an oath; that the

6    witness before testifying was duly sworn by me; that the
     foregoing 105 pages contain a true and accurate

7    transcript of the proceedings, all to the best of my
     skill and ability.

8

9            BE IT FURTHER KNOWN that examination of this
     transcript and signature of the witness was requested by
     the witness and all parties present.  On

10   _____, a letter was mailed or
     delivered to Mr. Todd M. Gaynor regarding obtaining

11   signature of the witness.

12           I FURTHER CERTIFY that I am neither employed by
     nor related to nor contracted with (unless excepted by

13   the Rules) any of the parties or attorneys in this case,
     and that I have no interest whatsoever in the final

14   disposition of this case in any court.

15

16

17                         _____
                           JEANNINE K. SIMS, CSR, RPR
18                         NM Certified Court Reporter #12
                           License expires:  12/31/11
19                         Paul Baca Court Reporters
                           500 Fourth Street, NW, Suite 105
20                         Albuquerque, New Mexico 87102

21

22

23

24

25