Page 1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

JTH TAX, INC., d/b/a LIBERTY
TAX SERVICE,

       Plaintiff,

v.                             CIVIL NO. 2:11CV59

TROY CLARK and SOUTHWEST TAX
STORES, LLC,

       Defendants.


VOLUME 2


DEPOSITION OF TROY CLARK
May 23, 2011
1:26 p.m.
500 4th Street, Suite 105
Albuquerque, New Mexico 87102


    PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:


TAKEN BY:   SADA L. SHELDON
             ATTORNEY FOR PLAINTIFF


REPORTED BY:  PAUL BACA, CCR #112
              PAUL BACA COURT REPORTERS
              500 4th Street, NW, Suite 105
              Albuquerque, New Mexico 87102

EXHIBIT 2

1  business, what factors did you use to determine that
2  value?
3      A.   Factors that were used would have been the
4  existing revenues of the business, like I say,
5  less -- or combined with the fact that the customer
6  list would not be transferred over, the
7  revenue-based assessment.
8      Q.   Did you do evaluation of any of the
9  tangible assets that you were transferring?
10     A.   They were -- the valuation of the tangible
11 assets were included in the assessment of the
12 values.  But the base, the main core of the
13 negotiated price, was based off of revenue.
14     Q.   What would be an estimate of the value of
15 the tangible assets from the business?
16     A.   I don't have a response for that.
17     Q.   You don't have a response because you
18 don't know?
19     A.   I'm not a licensed appraiser of assets,
20 nor did we go down that route specifically valuing
21 individual assets.
22     Q.   So what you're saying to me is when you
23 came up with the $520,000 sale price, you did not
24 take into consideration the value of the tangible
25 asset or you did?

1  on the account, we would be logged in under my name
2  and initiate the transaction.
3     Q.   What are other reasons why you'd log on to
4  the Freedom Tax account?
5     A.   As a signator on the account, having
6  other -- my other account at Wells Fargo, every time
7  I log in to one of my accounts the Freedom account
8  pulls up, so there is not a specific account into
9  Freedom Tax.
10    Q.   Why is your being a signator a part of the
11 condition of your purchase and sale with Freedom
12 Tax?
13    A.   That was an agreed-upon point with the
14 asset sale.
15    Q.   Why did you include it in the agreement?
16 What was your reasoning for including it in the
17 agreement?
18    A.   I had a $520,000 balance owed to me and
19 wanted to be able to see where the funds were at at
20 any point in time; simple form of collateral.
21    Q.   Have you ever put any money into the
22 Freedom Tax account?
23    A.   Not to my knowledge.
24    Q.   Let me clarify.  Has Southwest Tax ever
25 put any money into the Freedom Tax account?

1    A.    Not to my knowledge.  I don't -- I mean
2    the only -- I don't know that this has happened.
3    The only potential would be if there was an
4    incorrect amount, we paid it back.  But I don't
5    think that's ever happened.
6    Q.    Personally, have you, Troy Clark, ever put
7    any money into the Freedom Tax account?
8    A.    No.
9    Q.    Okay.  Explain to me the earn-out
10   agreement on page -- I guess it's 20- -- page 26.
11   In your purchase and sale agreement with Freedom Tax
12   you have an earn-out agreement.  The purchase price
13   will be subject to the following reductions.  What's
14   the -- what was the purpose behind putting this into
15   the purchase and sale agreement?
16   A.    This is actually the clause in the
17   agreement that allowed us to come to a mutual
18   agreement for the transaction to go forward.  When
19   we were notified and identified that -- informed, I
20   guess by Liberty through documents already
21   presented, of lack of ability to transfer over the
22   customer list.
23         Ms. Gutierrez obviously had concerns on
24   her part of the valuation.  So this was the
25   mechanism whereby I was able to give her comfort,

1   saying since there is not a customer list that you
2   can have control over to maintain the client base, I
3   will be willing to -- it was a way for me to
4   maximize my sales price, but have conditions that if
5   the conditions that I felt that existed she was
6   concerned about did not come to fruition, that she
7   could gain a comfort level that she was paying a
8   fair value.
9       Q.   So why did you go ahead and produce her
10  with tax customer information?
11          MR. GAYNOR:  I am going to object.  It
12  assumes facts not previously established on the
13  record.
14      Q.   (By Ms. Sheldon)  Okay.
15      A.   I have never testified nor have I ever
16  produced or provided her customer information.
17      Q.   But you provided -- we went over the
18  releases -- I can pull the exhibit again -- the
19  release of information.  She had faxed you a
20  release, and then you would fax back tax
21  information, correct?
22      A.   I would -- I did, at the client's
23  direction, forward their copies of their tax returns
24  at their request.  That's their personal data.
25      Q.   But who did you actually forward them to?

```
 1     A.    Well, they were forwarded through the
 2  office which they were requested from at Freedom
 3  Tax.
 4     Q.    So you gave Freedom Tax tax information?
 5           MR. GAYNOR:  That's not what he testified
 6  to.  Objection.
 7           MS. SHELDON:  Let's get it straight.  I
 8  want to make sure we get it straight.
 9     Q.    (By Ms. Sheldon)  So Freedom Tax would
10  send you a release of information form, correct?
11           MR. GAYNOR:  Why don't we start with the
12  actual exhibit, so we can all be on the same page.
13           16A you are talking about, right?
14     Q.    (By Ms. Sheldon)  Okay.  So I guess we
15  should go back over and explain how this works.
16           So Freedom Tax would either fax this over
17  to you or your dad would bring it home, correct?
18     A.    Freedom Tax would fax it over or they
19  would hand-deliver it.
20     Q.    And then would you go to the computer that
21  you had the tax information stored on?
22     A.    That's correct.
23     Q.    And you would print the tax return for
24  this person?
25     A.    That's correct.
```

```
 1            MR. GAYNOR:  For the record, we're
 2   referring to the document previously marked 16A.
 3       Q.   (By Ms. Sheldon)  Then what happened to
 4   the tax return after you printed it?
 5       A.   The tax return was then forwarded to the
 6   office that requested it, to be delivered to a
 7   customer.
 8       Q.   When you say "the office," you mean the
 9   Freedom Tax office?
10       A.   That is correct.
11       Q.   So the tax return would then go to the
12   Freedom Tax office and they could use it?
13       A.   That's not what I said.
14       Q.   Okay.  What could they do with it?  Where
15   was there any limitation on what they could do with
16   that tax information?
17       A.   The customer has asked for a request of
18   their information.  That's the customer's
19   information, just like your tax return is your tax
20   return.
21       Q.   Uh-huh.
22       A.   So the customer could then do whatever
23   they want with it.  If they needed it for
24   preparation of a tax return for Freedom Tax, they
25   could give that to Freedom Tax.  If they needed it
```

```
 1   for whatever reason, they would use it for that.
 2       Q.   But you never actually gave the tax return
 3   information to the customer, did you, or to the
 4   individual?
 5       A.   The tax customer -- the tax client signed
 6   the release authorizing me to deliver that to
 7   Freedom Tax.
 8       Q.   And you delivered it to Freedom Tax?
 9       A.   That's correct.
10       Q.   Okay.  You said you received about $90,000
11   in payments from Freedom Tax?
12       A.   Yes.
13       Q.   And what have you done with that money?
14       A.   I made application of those funds towards
15   outstanding loan balances that Southwest Tax has.
16       Q.   So is Southwest Tax still an active
17   company, LLC?
18       A.   As a result of this lawsuit, yes.
19       Q.   Did you have this purchase and sale
20   agreement reviewed by an attorney?
21       A.   Yes.
22       Q.   And who's the attorney?
23       A.   Vincent, Fontg, and Hansen.
24       Q.   Did you -- you also mentioned a line of
25   credit.  When I was asking you where the money was
```

1    Exhibit 21.
2             (Exhibit marked, 21.)
3       Q.    (By Ms. Sheldon)  So Exhibit 21 is a
4    promissory note between Freedom Tax and Southwest
5    Tax Stores for $520,000.
6             Can you explain this document to me?
7       A.    This is a promissory note evidencing the
8    outstanding balances, the loan payment that Freedom
9    Tax has to Southwest Tax for the purchase of the
10   assets.
11      Q.    It says on page 4 that there's a payment
12   of $50,000 to be made on March 15, 2011.
13            Have you received that payment?
14      A.    Yes.
15      Q.    And a payment of $80,000 to be made on
16   March 31, 2011.  Have you received that payment?
17      A.    Only a portion.
18      Q.    How much of that payment have you
19   received?
20      A.    An additional -- roughly $40,000.  It's
21   just over $40,000.
22      Q.    And then the remaining amount of $390,000
23   to be amortized set forth in Exhibit A1.  That's
24   based off of their revenue stream that they have.
25            Do you still have the purchase and sale

1  the promissory note?
2      A.   If you look at the last paragraph of
3  Section 1.4 beneath the earn-out agreement --
4      Q.   Okay.
5      A.   -- on December 31 of the current year any
6  and all reductions in the purchase price were
7  reflected in a cancellation of the existing
8  promissory note upon the buyer entering into a new
9  revised promissory note with the appropriate
10 reduction in the outstanding balances.
11          So what will happen is if the conditions
12 necessitate, according to Section 1.4, a reduction,
13 then the old promissory note will be cancelled and
14 the new one will be entered into, but only if a new
15 one is entered into for the applicable dollars.
16     Q.   So what was Freedom Tax's revenue so far,
17 January 1st, 2011, through, I don't know, April 30,
18 2011?
19     A.   You'd have to ask Freedom Tax that
20 question.
21     Q.   Have they given you any reports on their
22 revenues since operations?
23     A.   They have.
24     Q.   And when were those reports made?
25     A.   On a daily basis.

1   documents that you sent me this morning?
2          MS. SHELDON:  Yes.
3          MR. GAYNOR:  Let me take a look at them
4   first.
5          MS. SHELDON:  Sure.
6          (A recess was taken from 2:00 p.m. to 2:02
7   p.m.)
8          (Exhibit marked, 17.)
9    Q.   (By Ms. Sheldon)  Okay.  Now, where were
10  we?  Exhibit -- well, I've marked these one, two,
11  three, four checks as Exhibit 17.  The first page
12  is -- the first check was made out to San Mateo
13  Indian School, LLC, in the amount of $2,400.  Do you
14  know what that payment was for?
15         MR. GAYNOR:  Remember her admonition
16  earlier in the day, which was to not guess.
17   A.   This payment was made for the initial down
18  deposit and January rent.
19   Q.   (By Ms. Sheldon)  Okay.  And is that your
20  signature on this check?
21   A.   Yes.
22   Q.   What was the reason why you would write
23  this check?
24   A.   Ms. Gutierrez and I sat together to go
25  through the bills as we were contemplating the

1   transaction.  And she was there, I was there, I just
2   happened to sign them.  I'm a signator on the
3   account.  It was a bad habit of grabbing checks off
4   the printer and signing them.
5        Q.   And then it looks like there is also a
6   check made out to, you said, Mike S. Bilow for
7   $1,550.  Do you recall what this check was for?
8        A.   If we're referring to check number 3102,
9   it's for $1,500 even.  That would be for the January
10  rent of the Rio Rancho location.
11       Q.   Okay.  Is that your signature?
12       A.   Yes.
13       Q.   And what was the reason you signed this
14  check for Freedom Tax?
15       A.   The same as before.  Kim and I got
16  together to pay the bills, and I grabbed them off
17  the printer and signed them.
18       Q.   Was it the same day as the other check we
19  just looked at?
20       A.   Yes.
21       Q.   And the next check, check number 3104,
22  made out to Eubank Plaza West Investors for
23  $1,172 -- is that two cents or is that --
24       A.   That's correct.
25       Q.   What was this check for?

1  unwind?
2  A.   Southwest Tax no longer desired to be an
3  AD and was not going to be able to make the payment,
4  so we unwound it.
5  Q.   I just want to make sure we know what
6  we're talking about.
7       Earlier, we looked over the Exhibit
8  Number 21.  We looked at the promissory note between
9  Southwest Tax and Freedom Tax.  And page 4 of that
10 agreement, Exhibit 18, they showed you a payment of
11 80,000 to be made on March 31, 2011.  You said you
12 received about half of that.
13 A.   I received a portion of that.
14 Q.   And why didn't you receive the full
15 portion of that payment?
16 A.   The information that was communicated to
17 me was that they didn't have the funds to make the
18 full payment.
19 Q.   Have you taken any steps to try to enforce
20 the promissory note?
21 A.   No.  I've worked with them as accepting
22 the payments that they had made.
23 Q.   And what was the agreement between you and
24 Freedom Tax for the remainder of that payment?
25 A.   When they're able to make a payment.

1   Q.  Do they have a timeframe by which they
2   need to make the payment?
3   A.  Not at this point in time.
4   Q.  We also reviewed the document from where
5   you sold your personal residence in 2010. What was
6   the reasoning behind selling your personal
7   residence?
8   A.  I no longer needed a second residence.
9   Q.  What was that residence used for?
10  A.  I lived in it.
11  Q.  And what was your other residence at the
12  time, then? This was your second residence. What
13  was your first residence?
14  A.  Let me clarify. I lived in the house at
15  9809 Talea Court. I put it up for sale. I
16  purchased another home, moved into the other home,
17  and then when the 9809 Talea Court home sold I no
18  longer owned it.
19  Q.  So did you have -- how many residences did
20  you own in 2010?
21  A.  At any one point in time as many as two.
22  Q.  Okay. And what was the -- one of them,
23  I'm assuming, was the 9809 Talea address. What was
24  the other address?
25  A.  9809 Talea. The other is my current

```
 1   processing computers which it owns in my home.
 2      Q.   Okay.  And have you taken any steps to
 3   deliver to plaintiff all consumer tax returns,
 4   files, records, and copies since May 11, 2011?
 5      A.   As stated earlier, I delivered to Liberty
 6   Tax and have a receipt, an acknowledgment of the
 7   receipt of delivery of that information to Liberty
 8   Tax.
 9      Q.   And do you have any other copies of these
10   tax returns?
11      A.   I do not have any other external copies of
12   those tax returns.
13      Q.   What do you mean by "external copies"?
14      A.   The database that resides on the
15   processing computers is there.  I can't get rid of
16   it without a Liberty Tax code.  So I own the
17   computers, they sit at my house.
18           Are there any other files, customer files,
19   copies of customer lists?  No.  Those don't exist.
20   They have all been handed over to Liberty, and
21   Liberty has acknowledged the receipt of such.
22      Q.   Have you taken any steps to remove the
23   tax -- customer information from your processing
24   computers?
25      A.   No.
```

Page 52

1       Was that a business loss -- was that
2   proportioned among other partners of Southwest Tax?
3       A.   As it shows, it's proportion to the owner
4   of Southwest Tax, which is 100 percent.
5       Q.   And then TSC Exhibit 32 -- I'm sorry --
6   sent you a K-1 to Troy Clark, which shows an
7   ordinary business income of $1,115.
8            When you determined the revenue-based
9   price for Freedom Tax of $520,000, how were you able
10  to arrive at that figure from a company that appears
11  to have been losing money?
12      A.   As I say before, it was a methodology
13  based off of revenue, not net income.  What you see
14  there is taxable net income on the K-1.
15      Q.   So what was your --
16      A.   It was very different numbers.
17      Q.   What was the revenue for Southwest Tax in
18  2010?
19      A.   I don't recall with specificity, but in
20  the neighborhood of $400,000.  Maybe it was 393,000,
21  but I would have to rely upon actual documents to
22  verify the exact number.
23      Q.   Which documents would that be?
24      A.   The financial statements for Southwest Tax
25  Stores.

1                    CERTIFICATION

2

3        I, the officer before whom the foregoing
4   deposition was taken, do hereby certify that I
5   personally recorded the testimony of the witness
6   whose testimony appears in the foregoing deposition;
7   that said deposition is a true record of the
8   testimony given by said witness; that I am neither
9   attorney for, related to, nor employed by any of the
10  parties to the action in which this deposition is
11  taken, and that I am not a relative or employee of
12  any attorney employed by the parties hereto, or
13  financially interested in the action.

14

15

16                          _____
                            PAUL BACA, RPR, CCR
17                          Certified Court Reporter #112
                            License Expires:  12-31-11
18

19

20

21

22

23

24

25